IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHELTON DENORIA JONES, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-1825 |
| | § | |
| RICK THALER, | § | **DEATH PENALTY CASE** |
| Director, Texas Department of | § | |
| Criminal  Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S AMENDED RESPONSE IN OPPOSITION TO PETITIONER'S CROSS-MOTION FOR SUMMARY JUDGMENT

Petitioner Shelton Denoria Jones filed a first amended habeas corpus petition in this cause on July 9, 2009.  Docket Entry (D.E.) 7.  Respondent Thaler (the Director) answered and moved for summary judgment regarding all of Jones's claims.  D.E. 14.  The Court subsequently stayed these federal proceedings  pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), to allow Jones to return to state court to exhaust a previously unexhausted *Brady*[1] allegation. Following the state court's dismissal of Jones's successive state writ application raising the *Brady* and other previously unexhausted allegations, the Court lifted the stay.  The Director then filed an amended answer and motion for

---

[1]    *Brady v. Maryland*, 373 U.S. 83 (1963).

summary judgment regarding all of Jones's claims.  D.E. 32.  Jones's reply to the Director's amended answer, response to the Director's amended motion for summary judgment, and cross-motion for partial summary judgment regarding Claims 1, 2, and 14 of his first amended petition ("Amended Reply, Response, and Cross MSJ") followed.  D.E. 33.[2]  The Director now submits his amended response in opposition to Jones's amended cross-motion for summary judgment.  For the reasons discussed below, the Director urges the Court to reject Jones's arguments, deny his amended cross-motion for summary judgment, and grant summary judgment in the Director's favor.

---

[2]    On the same date, Jones filed a second motion seeking leave to conduct discovery regarding the *Brady* claim included in his first amended petition.  The Director addresses the merits of that amended motion in a separate filing.

## ARGUMENT

### I.   The Director, Rather Than Jones, Is Entitled To Summary Judgment Regarding Claims 1, 2, and 14.[3]

In Claim I, Jones contends his sentencing proceeding violated the Eighth Amendment because the punishment special questions then administered in Texas did not allow the jury to give full effect to the evidence Jones offered, *see Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*), and the nullification instruction administered by the trial court did not cure the alleged error, *see Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*).  First Am. Pet. at 16-47.  In Claim II, Jones argues that the nullification instruction itself represents an independent constitutional error in his sentencing proceeding.  First Am. Pet.

---

[3]      In Claim 14, Jones asserts that the evidence was legally insufficient to support the jury's punishment-phase determination that Jones posed a future danger.  First Am. Pet. at 138.  In his Amended Reply, Response, and Cross-MSJ, Jones contends he is entitled to summary judgment regarding Claim 14, but declines to brief the issue further.  D.E. 33 at 1 n.1.  Accordingly, regarding Claim 14, the Director notes his opposition to a grant of summary judgment in Jones's favor, but will stand on the arguments presented in his answer and motion for summary judgment.  D.E. 32 at 162-65.  The Director also stands on his briefing regarding Jones's remaining claims, finding that nothing in Jones's response to the Director's amended motion for summary judgment warrants a reply.  The only exception is Jones's contention that Claims IV, VII, VIII, and IX are not procedurally defaulted, based on Judge Womack's concurrence in *Ex parte Ruiz*, No. 27,328-03 (Tex. Crim. App. July 6, 2007) (Womack, J., concurring) (unpublished).  Jones's argument, which is foreclosed by the Fifth Circuit's recent opinions in *Balentine v. Thaler*, No. 09-70026, 2010 U.S. App. LEXIS 23699 (5th Cir. Nov. 17, 2010), and *Rocha v. Thaler*, Nos. 05-70028 & 09-70018, 2010 U.S. App. LEXIS 23696 (5th Cir. Nov. 17, 2010), is addressed in Part II, *infra*. In Parts III and IV, *infra*, the Director also corrects Jones's respective contentions regarding the deference due the state court's findings and the discovery standard in federal habeas proceedings.

at 47-51.   The Director has argued in his amended answer and motion for summary judgment that these claims are without merit, and that Claim II is additionally unexhausted, procedurally-barred, and *Teague*-barred.   D.E. 32 at 32-58.   In his Amended Reply, Response, and Cross-MSJ, Jones launches various assaults against the Director's arguments.   Below, the Director addresses only those of Jones's specific contentions warranting a response.

## A.   The record speaks for itself regarding Jones's punishment phase evidence and argument.

Jones contends that the Director has misrepresented the evidence Jones offered during the punishment phase, as well as the purpose for which his counsel presented it.   D.E. 33 at 4-6.   An examination of the record, however, reveals that it is Jones who has attempted to recharacterize the defense's punishment evidence and argument.

In his amended answer and motion for summary judgment, the Director discussed in detail the punishment evidence that Jones presented and the patently clear defensive strategy driving it.   D.E. 32 at 36-49.   The Director will not belabor that evidence here, but will merely note the following:   Unlike Penry, Jones did not present evidence that he suffered from a mental defect or mental illness.   *See* SHCR-03 at 67-68 (¶¶ 46-47, 49-50).   And despite Jones's evidence that his biological father did not play a significant role in his

4

upbringing, Jones's evidence also did not show that he was the product of an unstable family background or anything remotely resembling a "troubled childhood." *See* SHCR-03 at 67-68 (¶¶ 46-47, 49-50). In fact, Jones's evidence established quite the contrary. His own expert, Dr. Browne, testified that Jones suffered from *no* mental disorder and had experienced a *stable* upbringing. XXXIII RR 108-10, 113; *see also* SHCR-03 at 67-68 (¶¶ 46-47, 49-50). Jones's relatives testified that although from a young age, Jones had little contact with his biological father, his stepfather became Jones's "real father" and exerted a strong positive influence in Jones's life. XXXIII RR 143-44, 192; XXXIV RR 235-36. Thus, no matter how he now tries to recharacterize it, Jones's evidence was not the kind at issue in *Penry I* and its progeny. *See e.g., Penry I*, 492 U.S. at 307-09 (evidence of mild to moderate mental retardation; organic brain damage caused at birth and by frequent childhood beatings; and severe childhood abuse, including being locked for extended periods in a closet without access to a toilet); *Brewer v. Quarterman*, 550 U.S. 286, 289-90 & 290 n.1 (2007) (evidence that the defendant suffered a major depressive episode shortly before the offense, requiring involuntarily commitment to a mental facility; was neglected by his stepfather; had no relationship with his father until age fifteen, and the father then physically abused and neglected him; frequently witnessed his father beat his mother; and abused drugs); *Abdul-Kabir v. Quarterman*, 550

5

U.S. 233, 239-40 (2007) (defendant's parents lived together sporadically for ten years; shortly after defendant's birth, father was arrested for robbing a liquor store and deserted the family when defendant was five years old; the final time defendant saw his father, the father dropped him a block away from where the father believed the mother lived and told the defendant to "go find her;" defendant's alcoholic mother placed defendant and his sister in grandparents' care, who were also alcoholics and did not want the children living with them; mother later placed defendant, but not his sister, in a church-run children's home).

And despite Jones's strained, after-the-fact efforts to show otherwise, the transcript assuredly demonstrates that counsel's punishment strategy was indeed to persuade the jury that Jones's conduct was not deliberate and that he posed no future danger. As to Jones's complaint that the Director omitted an allegedly crucial sentence when discussing Jones's punishment argument, *see* D.E. 33 at 5-6, the Director asserts the complained-of missing sentence does not lessen the force of his argument. The Director stated:

> Counsel's only mention of Jones's abandonment by his biological father was to emphasize Jones's peaceable nature and lack of dangerousness, rather than his lack of culpability for his crime:
>
>> You have had an opportunity . . . to observe [Jones's] demeanor. You have heard from his mother, from his friends, from his jailer. He's not a violent person. He

has no violent outburst of temper.  He's never become violent in their presence.  In short, you have a young man who's intelligent, who has a good background, even though his biological father has abandoned him since he was born; never had anything to do with him.  He was raised by a loving mother and a stepfather.  He went to work with his stepfather, you will recall his boss' [sic] testimony, and they were one of the most valued teams he had, if not the most valued team.

XXXIV RR 235-36.  Counsel's brief reference to Jones's biological father was to emphasize that, despite any estrangement from his biological parent, Jones in fact had both a loving mother and a strong father figure in the form of his stepfather, and that these parents raised a nonviolent young man who had overwhelmingly been a productive member of society when given structure and positive role models.

D.E. 32 at 45. Jones protests that the Director omitted the next line in the transcript, in which counsel stated, "I believe all of these, ladies and gentlemen, are mitigating circumstances, mitigating evidence, that by law you must consider." XXXIV RR 236.  Disregarding the punishment evidence counsel presented, the questions counsel posed to both defense and prosecution witnesses at both phases of trial, and counsel's closing argument up to this point in the transcript, *see* D.E. 14 at 34-47, Jones asserts that the line in question magically transformed the overwhelming thrust of his punishment argument—that Jones's violent behavior was not deliberate and represented an aberration in an otherwise peaceful existence—into an argument designed to persuade the jury that Jones was less morally culpable for his crime.  But one

sentence out of one hundred and ninety-one lines of the defense's closing

punishment argument—a sentence which moreover contains only a generalized

reference to "mitigation"—does not possess this transformative power.

Further, the Director welcomes Jones's implicit invitation to examine the

remainder of counsel's closing argument; it unequivocally emphasizes Jones's

lack of deliberation in murdering Soboleski and lack of future dangerousness,

rather than suggests any reduced moral culpability:[4]

> [Jones] had an opportunity to kill three witnesses: Linda Ligon, Mr.
> [Johnny] Green, Mr. [Walter] Green.  Three witnesses.  He did not
> avail himself of that opportunity.[5]
> You recall when these two young men over here were talking

---

[4]    As the Director discussed in his amended answer and motion for summary judgment, D.E. 32 at 44 n.22, counsel spent part of his closing argument attempting to rebut the State's assertions that Jones's murderous conduct was deliberate.  The remainder he used to show that Jones would not pose a future danger if allowed to live.

[5]    To the extent counsel's comment had relevance beyond the issue of Jones's future dangerousness, the CCA reasonably concluded that the evidence that Jones did not avail himself of an opportunity to compound his crime by killing eyewitnesses is merely a species of good character evidence.  As discussed in Part I(B), *infra*, relying on *Graham v. Collins*, 506 U.S. 461, 475-76 (1993), the CCA reasonably concluded that the former special questions encompass such evidence.  *See Ex parte Jones*, No. AP-75,896, 2009 Tex. Crim. App. Unpub. LEXIS 480, *17 (Tex. Crim. App. 2009); *see also Garcia v. Quarterman*, 257 Fed. Appx. 717, 722 (5th Cir. 2007) (per curiam) (opinion substituted for the panel's prior opinion at 456 F.3d 463 (5th Cir. 2006) (holding that *Abdul-Kabir* did not alter the Supreme Court's earlier ruling in *Franklin v. Lynaugh*, 487 U.S. 164, 177-78 (1988)); *but see Pierce v. Thaler*, 604 F.3d 197, 210 (5th Cir. 2010) (holding that *Franklin*, *Brewer*, *Abdul-Kabir*, and the Supreme Court's subsequent jurisprudence regarding California's death penalty statute require an additional jury instruction regarding good character evidence).  The differing results reached by the *Garcia* and *Pierce* panels on the issue of good character evidence demonstrate the reasonableness of the CCA's conclusion.

on voir dire, that a deliberate act is one, for instance, when you take all the people in the back of the U-Totem or the Circle K and kill them to remove all witnesses.  [Jones] had that opportunity. He didn't do it.

*I submit to you that's evidence of something less than a deliberate act*, by their own voir dire hypothetical.

What, in effect, the State is doing is asking you on the basis of some four or five days in this man's life to find *that he deliberately did what he is accused of doing and that he will continue to be a threat to society by committing acts of violence against property or persons in the future.*  Something that even a trained professional would not give his opinion on, because it's unethical for his group to do that, but the indicators are that it will not happen.  On the basis of the best scientific tools that they have, *he will not be a threat to society by committing acts of violence against persons or property in the future.*

You heard the testimony.  You heard his mother ask you to spare his life.  I'm asking you to spare his life.  It's time to stop this tragedy now and not let it spread to another family and not to another generation.  Thank you.

XXXIV RR 236-37 (emphasis added).  In short, the punishment hearing and closing argument transcripts clearly demonstrate that counsel overwhelmingly emphasized the evidence's relevance to the deliberateness and future dangerousness special questions, rather than its relevance to his moral culpability.[6]

---

[6]    Jones is correct that the panel that decided *Garcia v. Quarterman*, 456 F.3d 463 (5th Cir. 2006), later substituted an opinion suggesting that, after *Abdul-Kabir*, the purpose for which a defendant offers evidence at punishment is not relevant to whether an additional instruction is required.  *See Garcia*, 257 Fed. Appx. 717, 723 (5th Cir. 2007).

**B.** **Brewer** and **Abdul-Kabir** do not dictate relief in Jones's case, and therefore the CCA's rejection of Jones's *Penry* claim was not an unreasonable application of clearly-established federal law as determined by the Supreme Court.  (Claim I).

For Jones to obtain relief, AEDPA requires him to show that the CCA unreasonably applied "clearly established Federal law, *as determined by the Supreme Court of the United States.*"  28 U.S.C. § 2254(d)(1) (emphasis added). A state-court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).   Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09.  Neither scenario occurred in Jones's case.

In its opinion denying relief on Jones's *Penry* claim, the CCA summarized the mitigating evidence that Jones contends the former special issues put out of the jury's reach: (1) "a psychological impairment that makes him susceptible to the influences of consistent, stronger, anti-social personalities in his environment"; (2) abandonment by his biological father; and (3) evidence of good character traits, namely, intelligence, work ethic, reliability, and

trustworthiness. *Ex parte Jones*, 2009 Tex. Crim. App. Unpub. LEXIS 480, *6 (Tex. Crim. App. 2009).   The CCA then analyzed Jones's claim.   First, it concluded that Jones's evidence met the low threshold for relevance set forth in *Tennard v. Dretke*, 542 U.S. 274 (2004).   *Id.* at *9.   After setting forth the applicable law, the CCA then noted that the Supreme Court has found the following circumstances to fall beyond the scope of the former special issues: a troubled childhood, *id.* at 14 (citing *Brewer*, 550 U.S. at 289-90); learning disabilities, low IQ, or special education status, *id.* (citing *Smith v. Texas*, 543 U.S. 37, 48 (2004) (*Smith I*); neglect, abandonment, and neurological damage *id.* (citing *Abdul-Kabir*, 550 U.S. at 240-41, 256); substance abuse, family violence during childhood, mental illness, and domination by another, *id.* (citing *Brewer*, 550 U.S. at 295-96).   In contrast, the court noted that youth is a circumstance falling within the scope of the former special issues.   *Id.* at *13-14 (citing *Johnson v. Texas*, 509 U.S. 350, 369 (1993), and *Graham v. Collins*, 506 U.S. 461, 475-76 (1993)).   Relying on *Graham*, the CCA similarly concluded that evidence of redeeming personal qualities is a circumstance encompassed by the former special issues.   *Id.*

> We observe that in [*Graham*], the Supreme Court held that proffered mitigating evidence of the defendant's youth, background of difficult upbringing, and his redeeming character traits could be given constitutionally adequate consideration in the course of the

jury's deliberation on the special issues and was thus not beyond
the effective reach of the jury.

*Id.* at *16.

The CCA then proceeded to compare Jones's evidence to that found in

Supreme Court cases holding that the defendant's evidence fell beyond the

scope of the former special issues.   The CCA noted that in *Smith I*, the

defendant's evidence showed that at an early age, he had been diagnosed with

potential organic learning disabilities and speech handicaps; as a result of IQ

scores of 75 and 78, had attended special education classes during most of his

time in school; despite his low IQ and learning disabilities, his school behavior

was often exemplary; his father was a drug addict who engaged in gang violence

and stole money from relatives to support a drug addiction; and he was only

nineteen years old when he committed the crime.  *Id.* at *14; *see also Smith I*,

543 U.S. at 41.  Turning to *Abdul-Kabir*, the CCA noted that the mitigating

evidence in that case included family members' testimony regarding the

defendant's unhappy childhood of neglect and abandonment, and expert

testimony from two psychologists that the defendant's violent propensities and

dangerous character were caused by factors beyond his control (neurological

damage and childhood neglect and abandonment).  *Jones*, 2009 Tex. Crim. App.

12

Unpub. LEXIS at *16; *see also Abdul-Kabir*, 550 U.S. at 240-41, 256. The CCA likewise noted that in *Brewer*, the defendant's evidence included that he had suffered from depression three months before the offense and that the depression had been significant enough to require brief hospitalization; that his co-defendant, a woman with whom he was obsessed, dominated and manipulated him; the defendant had been abused by his father and witnessed his father abusing the defendant's mother; and the defendant abused drugs. *Jones*, 2009 Tex. Crim. App. Unpub. LEXIS at *16; *see also Brewer*, 550 U.S. at 289-90. Finally, the CCA noted that the defendant in *Penry I* presented evidence of mental retardation and severe childhood abuse. *Jones*, 2009 Tex. Crim. App. Unpub. LEXIS at *16; *see Penry I*, 492 U.S. at 308-10. The CCA further examined the mitigating evidence presented in state cases in which it had granted relief on *Penry* claims. *Jones*, 2009 Tex. Crim. App. Unpub. LEXIS at *17-19. The CCA concluded that the evidence in each of the cases discussed above differed markedly from Jones's mitigating evidence:

> We are unconvinced that [Jones's] proffered mitigating evidence was outside the scope of the special issues. [Jones] did not show evidence of a seriously troubled childhood. Rather, evidence showed that he had a stable family background and was raised in a cohesive two-parent household, albeit not by his biological father, who abandoned him. There was no evidence of learning disabilities, low IQ, or neurological damage. Rather, there was testimony about [Jones's] intelligence. There was no testimony that he had abused substances. Although [Jones] presented evidence

that he suffers from psychological irregularities or deficits, including what his psychologist expert witness described as "empty vessel syndrome," which made him susceptible to being influenced by others, such evidence is a far-cry from the sort of psychological mitigation evidence that has been determined to be *Penry* evidence. Further, the facts of the offense rebut that assessment as to the offense charged; [Jones] shot a police officer during a traffic stop, without provocation or urging of armed violence by his companion. The testimony as to his youth and redeeming character traits is the sort that the Supreme Court has held to fall within the scope of the special issues.

*Id.* at *20-21.   The CCA concluded that although Jones's evidence met *Tennard*'s minimum threshold for relevance, ultimately its relevance to Jones's moral culpability was sufficiently "tenuous" or de minimus that relief was not warranted under *Abdul-Kabir*.   *Id.* at *21.   Specifically, the CCA cited the following passage from *Abdul-Kabir*:

The Chief Justice's dissent incorrectly assumes that our holding today adopts  the rule advocated by the petitioner in [*Graham*], namely, that "'a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues.'" The rule that we reaffirm today—a rule that has been clearly established since our decision in *Penry I*—is this: Special instructions are necessary when the jury could not otherwise give *meaningful effect* to a defendant's mitigating evidence. The rule is narrower than the standard urged by Graham because special instruction is not required when mitigating evidence has only a tenuous connection—"*some* arguable relevance"—to the defendant's moral culpability.

*Adbul-Kabir*, 550 U.S. at 254 n.14 (emphasis in original; internal citations omitted).   Further, the CCA determined that the evidence of Jones's youth and

14

redeeming characteristics are the type of evidence that the Supreme Court has recognized as falling within the scope of the former special issues. *Id.* at *21-22.

The CCA's conclusion does not represent an unreasonable application of the Supreme Court's *Penry* jurisprudence. In *Johnson*, the Supreme Court squarely held that the defendant's youth is a circumstance that falls well within the scope of the special questions. 509 U.S. at 368 ("We decide that there is no reasonable likelihood that the jury would have found itself foreclosed from considering the relevant aspects of petitioner's youth . . . We believe there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination.").

As to evidence of Jones's redeeming qualities, although Jones relies on a recent Fifth Circuit panel decision concluding that an additional instruction was required in order for a jury to consider and give effect to the defendant's good character evidence, *see Pierce v. Thaler*, 604 F.3d 197, 210 (5th Cir. 2010), its conclusion does not render the CCA's application of Supreme Court precedent to Jones's case "unreasonable" under AEDPA.[7] Initially, Jones fails to note that

---

[7]        Pierce introduced evidence of his good character before the crime, including that he was kind to his mother, was honest and admitted past wrongs to her, and regularly attended church. *Id.* at 208. Pierce additionally presented evidence that he had matured emotionally and spiritually in prison, developing his ability to speak and articulate his thoughts and growing more open and able to communicate his

the *Pierce* panel's decision directly contradicts an earlier, but post-*Adbul-Kabir* panel opinion holding that the law regarding good character evidence "is clear. *Abdul-Kabir* did not alter the Supreme Court's ruling in *Franklin v. Lynaugh* that evidence of good character can be given sufficient mitigating effect by the second special issue." *Garcia v. Quarterman*, 257 Fed. Appx. 717, 722 (5th Cir. 2007) (per curiam) (opinion substituted for the panel's prior opinion at 456 F.3d 463 (5th Cir. 2006)).   But even if the *Pierce* panel's reading of *Graham* is correct, then at most, the CCA's conclusion that *Graham* precluded relief regarding Jones's good character evidence was *erroneous*.   But incorrectness is not enough for relief under AEDPA; the conclusion must also be unreasonable. A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11.   Rather, federal habeas relief is *only* merited where the state-court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion."   *Woodford v.*

---

feelings. *Id.* Pierce further presented evidence that had furthered his education while in prison by improving his reading skills and had developed his talent for art and woodworking.  *Id.*

*Visciotti,* 537 U.S. 19, 27 (2002); *Williams,* 529 U.S. at 411.  As the Supreme

Court has explained,

> the range of reasonable judgment can depend in part on the nature
> of the relevant rule.  If a legal rule is specific, the range may be
> narrow.  Applications of the rule may be plainly correct or incorrect.
> Other rules are more general, and their meaning must emerge in
> application over the course of time.  Applying a general standard to
> a specific case can demand a substantial element of judgment.  As
> a result, evaluating whether a rule application was unreasonable
> requires considering the rule's specificity.  The more general the
> rule, the more leeway courts have in reaching outcomes in case by
> case determinations.

*Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

Here, the CCA's application of clearly established federal law as

interpreted by the Supreme Court was not unreasonable.  The *Pierce* panel's

decision turned on the following points.  First, it noted that in *Franklin v.

Lynaugh*, 487 U.S. 164 (1988), a plurality opinion, five justices—two concurring

and three dissenting—indicated in dicta that the special issues would not allow

a jury to give meaningful consideration to "good character" evidence.  *Pierce*,

604 F.3d at 208-09.  It additionally emphasized Justice O'Connor's concurrence

in the *Franklin* case.  *Id.* at 209.  Therein, Justice O'Connor opined that,

although evidence of a defendant's good behavior in prison (the specific evidence

at issue in Pierce's case) did not require an additional instruction because it had

no relevance to any issue except his future dangerousness, she distinguished

17

evidence of voluntary service, kindness to others, and religious devotion, stating that such evidence would require an additional instruction. *Id.* But it was not *unreasonable* for the CCA not to attribute dispositive significance to *Franklin*, a plurality opinion, let alone to opinions voiced in *Franklin*'s dissents and concurrences. That is especially true when the judgment of the Court denied relief and, moreover, the evidence at issue in that case (a clear disciplinary record) was wholly distinct from the evidence Jones offered at his trial.

The *Pierce* panel then examined the Supreme Court's jurisprudence concerning California's former death penalty statute. *Id.* (citing *Ayers v. Belmontes*, 549 U.S. 7, 15 (2006); *Brown v. Payton*, 544 U.S. 133, 142-43 (2005); and *Boyde v. California*, 494 U.S. 370, 382 n.5 (1990)). The panel noted that in these cases, the Supreme Court held that character evidence has relevance to a petitioner's moral culpability. *Id.* But these cases concerned mitigating evidence in the distinct context of California's former capital sentencing scheme, not Texas's former special issues. As the *Pierce* panel itself noted, the Supreme Court "has addressed good character evidence in the context of the Texas special issues only once since *Franklin*, in [*Graham*]." *Id.* at 210.

As for the Supreme Court's statement in *Graham* that the special issues allowed the jury to give some effect to the defendant's evidence that he was a generous and religious person, the *Pierce* panel found this statement to be

18

dicta—rather than *Graham*'s holding—and inconsistent with the "meaningful effect" standard the Court later adopted in *Abdul-Kabir*. *Id.* at 210. But assuming for the sake of argument that the CCA's reading of *Graham* was incorrect, the existence of numerous Fifth Circuit cases reading *Graham* in exactly the same way demonstrates that the CCA's interpretation of *Graham* was nevertheless not unreasonable. *See Garcia*, 257 Fed. Appx. at 722; *Bower v. Dretke*, 145 F. App'x 879, 885 (5th Cir. 2005) (per curiam) (quoting *Barnard v. Collins*, 958 F.2d 634, 640 (5th Cir. 1992)); *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007); *Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999). Although the *Pierce* panel attempted to distinguish *Bower*, *Barnard*, *Coble*, and *Boyd* by noting that those decisions predate *Abdul-Kabir*, the *Pierce* panel was silent concerning the *Garcia*'s panel's earlier and directly contrary decision, which post-dated *Abdul-Kabir*. *See Pierce*, 604 F.3d at 210 n.9. This disagreement by reasonable jurists demonstrates that the CCA's interpretation of *Graham* was not unreasonable.

Similarly, the CCA's conclusion—that Jones's evidence of a "troubled childhood" was sufficiently de minimis that an additional instruction was not required under *Abdul-Kabir*—was also not unreasonable. Although the Supreme Court has found that abandonment by a parent can represent mitigating evidence that is beyond the special questions's scope, *Abdul-Kabir*,

19

550 U.S. at 240-41, 256, that finding occurred in a context that did not contemplate a situation such as Jones's. A father's abandonment of his male child is primarily, if not exclusively, relevant to the extent it deprives the child of a positive male role model and a stable, two-parent household. But Jones did not suffer such a deprivation; his mother remarried and his stepfather assumed the role of a loving father and male role model. *See* XXXIII RR 143-44, 192; XXXIV RR 235-36 (testimony that, although from a young age, Jones had little contact with his biological father, his stepfather became Jones's "real father" and exerted a strong positive influence in Jones's life). Under such circumstances, it was not unreasonable for the CCA to conclude that Jones's evidence of abandonment by his biological father was sufficiently tenuous that there was no need for an additional instruction.[8]

Likewise, it was not unreasonable for the CCA to conclude that Jones's evidence of psychological deficits—the "empty vessel" personality described by his expert—possessed such minimal relevance to Jones's moral culpability that an additional instruction was not required by *Abdul-Kabir*. As the CCA noted,

---

[8]   To the extent that the *Pierce* panel concluded that evidence of a troubled childhood—specifically, evidence that older boys led the younger defendant astray and that the defendant spent large parts of his adolescence incarcerated in the Texas Youth Commission—Jones presented no such evidence at the punishment phase of his trial. *See Pierce*, 604 F.3d at 208. Jones's evidence, in fact, showed just the opposite, that he had been raised in the bosom of his loving family.

20

Jones's "empty vessel" evidence is far removed from the type of severe mental impairment evidence that the Supreme Court has found requires an additional instruction.   Further, Jones's "empty vessel" evidence had but tenuous mitigating value, given that the facts of the offense; Jones shot a police officer during a traffic stop, without provocation or urging of armed violence by his companion.

In short, Jones invests the Supreme Court's decisions in *Brewer* and *Abdul-Kabir* with near-talismanic power, arguing essentially that those opinions automatically dictate relief for any capital defendant whose jury received Texas's former special questions.   But as the *Abdul-Kabir* majority itself stressed, the Court's rulings in those companion cases do not compel the result Jones advocates.   550 U.S. at 259 n.20 (assuring the four dissenting justices in that case that "the rule we adopt today" will not "require a new sentencing in every case.").   And they do not in Jones's case.

As the Director has discussed in the preceding section, Jones offered his evidence to forestall affirmative answers to the deliberateness and future-dangerousness special questions, rather than to show that he was not fully culpable for his crime.   Jones's case thus represents the inverse of *Abdul-Kabir*.   There, "the strength of [the defendant's] mitigating evidence was not its potential to contest his immediate dangerousness . . . Instead, its strength was

21

its tendency to prove that his violent propensities were caused by factors beyond his control–namely, neurological damage and childhood neglect and abandonment." 550 U.S. at 241. In other words, in *Abdul-Kabir*, the defendant's "evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence." *Id.* at 259. The strength and purpose of Jones's evidence, however, was its capacity to show precisely the opposite—that Jones possessed an able mind, and as the product of a stable and caring environment, no deeply ingrained destructive propensities which would make a repetition of violence reasonably likely. Nor did the prosecution in Jones's case, as the State did in *Brewer and Abdul-Kabir*, suggest that the jury lacked "the power to exercise moral judgment" in determining the appropriate sentence. *Brewer*, 550 U.S. at 291; *see Abdul-Kabir*, 550 U.S. at 261. The special questions submitted to Jones's jury thus fully encompassed the mitigating value of his evidence. Alternatively, Jones's mitigating evidence possessed such a tenuous connection to the issue of his moral culpability that the special questions met constitutional requirements. *Abdul-Kabir*, 550 U.S. at 254 n.14.

Further, Jones's reliance on *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007), is misplaced. Jones argues that *Coble* is indistinguishable from his own

case, but like *Brewer* and *Abdul-Kabir*, it is entirely distinguishable. Jones's punishment evidence showed no mental illness and a stable childhood complete with a strong father figure, despite a separation from his biological father. In contrast, Coble presented evidence of a seriously troubled childhood. *Id.* at 445 (noting that Coble's father died before Coble was born, his mother suffered a nervous breakdown when he was eleven years old, and he subsequently lived at a state-run orphanage until the age of seventeen). Coble additionally presented expert testimony that he suffered from post-traumatic stress disorder due to his combat experience in Vietnam, as well as bipolar disorder and depression. *Id.* His experts testified that the first two disorders disposed Coble to become "[p]otentially explosive and potentially aggressive and assaultive," but that medication could temper Coble's propensity towards violence. *Id.* The Fifth Circuit concluded that, even though the jury could consider this evidence in determining whether Coble acted deliberately and whether he would pose a future danger, the evidence had potential mitigating value beyond the scope of these special issues. *Id.* at 447-48. It accordingly found the special issues constitutionally inadequate as applied to Coble. *Id.* at 448. Because Jones presented no such evidence, *Coble* is inapposite. Further, for Jones to obtain relief, AEDPA requires him to show that the CCA unreasonably applied "clearly established Federal law, *as determined by the Supreme Court of the United*

23

*States.*" 28 U.S.C. § 2254(d)(1) (emphasis added). The issue is thus whether the CCA unreasonably applied the Supreme Court's holdings in *Penry I* and its progeny when it denied Jones relief on his *Penry* claim, and not the conclusion a federal appellate court reached in *Coble*, a distinguishable case. And for the reasons the Director has discussed, Jones has not shown an unreasonable application of Supreme Court precedent.

### C.   Jones's allegation that the nullification instruction administered to his jury represented an independent constitutional error is unexhausted and lacks merit. (Claim II).

In his amended answer and motion for summary judgment, the Director argued that Jones did not exhaust Claim II in the state courts because he did not fairly present the claim to the CCA. D.E. 32 at 53-55. Alternatively, the Director asserted that the claim is *Teague*-barred and lacks merit.[9] D.E. 32 at 55-58. Jones's arguments to the contrary are similarly without merit.

### 1.   Jones did not fairly present Claim II to the CCA.

Jones insists that he presented Claim II to the CCA. D.E. 33 at 22. Jones's third state writ application and brief on submission, however, show that Jones consistently argued *one* claim to the CCA, that which he now presents in his first amended federal petition as Claim I—that the special questions did not allow the jury to give meaningful effect to certain evidence he presented to it,

---

[9]      Regarding these points, the Director stands on the briefing contained in his amended answer and motion for summary judgment.

and the supplemental nullification instruction did not cure the error.

Texas Rule of Appellate Procedure 73.1 (c) requires that a writ "application must specify all grounds for relief." Tex. R. App. P. 73.1(c). Similarly, Texas Rule of Appellate Procedure 38 requires briefs to "state concisely all issues or points presented for review." Tex. R. App. P. 38.1.(f). If, as he asserts, Jones wished to raise a stand-alone claim alleging that the nullification instruction represented an independent source of error, his third state writ application and later briefing did not satisfy these state procedural rules. Further, his argument was not sufficient to alert the CCA to the nature of his additional claim.

In his third successive state writ application, Jones stated a single "*claim for relief*":

### CLAIM FOR RELIEF

IV.   THE FORMER SPECIAL ISSUES FAILED TO PROVIDE AN ADEQUATE VEHICLE FOR THE SENTENCING JURY TO GIVE FULL CONSIDERATION AND FULL EFFECT TO THE MITIGATING EVIDENCE PRESENTED AND THE NULLIFICATION INSTRUCTION ISSUED SUFFERS FROM THE SAME DEFECTS THAT THE SUPREME COURT FOUND UNCONSTITUTIONAL IN *PENRY II* [*Penry v. Johnson*, 532 U.S. 782 (2001),] AND *SMITH v. TEXAS* [543 U.S. 37(2004) (*Smith I*)], IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

*Ex parte Jones*, AP-75,896, Application for Post-Conviction Writ of Habeas

25

Corpus at 17 (Tex. Crim. App. 2009).  The statement of Jones's claim did not

assert, as he now does in Claim II, that the nullification instruction constituted

an independent source of error.  *See id.*  Examination of his brief on submission

reveals a similar defect.  Jones summarized the argument he would present in

his brief as follows:

> *The former special issues as modified by the nullification*
> *instruction* failed to permit Mr. Jones's capital sentencing jury to
> fully consider and give effect to Mr. Jones's constitutionally relevant
> mitigating evidence, including evidence of psychological impairment
> through an expert witness and Mr. Jones's abandonment by his
> biological father and separation from his mother at an early age.
> Mr Jones objected to the punishment scheme and the trial court was
> placed on notice about the potential Eighth Amendment problem in
> the sentencing scheme.
>
> > *The problematic special issues in conjunction with the*
> > *nullification instruction* and as applied to the mitigating evidence
> > in this case resulted in an error that defies harm analysis; however,
> > because harm to Mr. Jones from these serious errors satisfies any
> > standard that could be applied to him—not harmless beyond a
> > reasonable doubt, "some" harm, or "egregious" harm—[the CCA]
> > need not decide in this case which harm standard, if any applies.

*Ex parte Jones*, AP-75,896, Br. on Submission at 7 (Tex. Crim. App. 2009)

(emphasis added).  This summary does not assert that the nullification

instruction constituted an independent source of constitutional error.  Rather,

it previews the two-fold argument Jones would make in his brief, that:  (1) his

case was indistinguishable from *Penry II* because he presented evidence which

fell beyond the scope of the former special questions, and the nullification

instruction did not cure the underlying constitutional deficiency, *see Penry II,*

532 U.S. at 788-90; and (2) he could meet any standard of harm the CCA applied, if it found his *Penry* allegation meritorious. *Ex parte Jones*, AP-75,896, Br. on Submission at 8-53 (Tex. Crim. App. 2009). Indeed, Jones's brief headings tracked these two arguments:

> I.   THE SENTENCING JURY AT MR. JONES'S CAPITAL MURDER TRIAL WAS UNABLE TO GIVE ITS REASONED MORAL RESPONSE TO MR. JONES'S MITIGATING EVIDENCE, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.
>
> ***
>
> II.  MR. JONES IS ENTITLED TO RELIEF UNDER ANY STANDARD.

*Id.* at 8, 19. The heading for Part II(B) of his brief again emphasized the interaction of the special issues and the nullification instruction, rather than arguing that the nullification instruction represented an error independent of the special questions:

> B.   The Constitutionally Infirm Capital Sentencing Scheme Established By the Trial Court–*the Special Issue in Conjunction with the Nullification Instruction*–Defies Harmless Error Standards.

*Id.* at 26 (emphasis added).

Thus, assuming only for purposes of argument that his present Claim II can somehow be read into Jones's third writ application and later briefing to the CCA, it is clear that Jones did not raise the claim in a procedurally correct manner, which precludes his satisfying AEDPA's "fair presentation" requirement. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) ("The purposes

of the exhaustion requirement . . . would be no less frustrated were we to allow federal review to a prisoner who had *presented* his claim to state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it.") (emphasis in original); *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (raising a claim "for the first and only time in a procedural context in which its merits will not be considered . . . does not . . . constitute fair presentation.") (internal quotation omitted).

But Jones's state-court briefing cannot be reasonably understood to have raised his present Claim II.  Jones's argument in his third writ application regarding the nullification instruction was limited to showing that the instruction given in his case was materially indistinguishable from those administered in *Penry II* and *Smith I.  Ex parte Jones*, AP-75,896, Application for Post-Conviction Writ of Habeas Corpus at 27-28 (Tex. Crim. App. 2009). Neither of those cases considered whether the nullification instruction itself, independent of an underlying *Penry I* violation, constituted a constitutional error warranting reversal of the sentence. *See Penry II*, 532 U.S. passim; *Smith I*, 543 U.S. passim.  While Jones averred in his third application that the nullification instruction "injected capriciousness into the sentencing process," *Ex parte Jones*, AP-75,896, Application for Post-Conviction Writ of Habeas Corpus at 28 (Tex. Crim. App. 2009), this brief allusion buried amid his other argument

was insufficient to alert the CCA that Jones was also asserting that the nullification instruction represented an *independent* source of error apart from the alleged *Penry I* violation. *Cf. Wilder v. Cockrell*, 274 F.3d 255, 260 (5th Cir. 2001) ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights."). And although in his brief on submission, Jones referred to the nullification instruction as "structural error," he did so in the context of *the proper harm analysis* the CCA should apply if it found an underlying *Penry* violation—not in the context of a stand-alone claim that the nullification instruction constituted independent error: "A sentencing scheme that conditions consideration of any of a defendant's constitutionally relevant mitigating evidence on jurors' willingness to disregard their oaths to render a true verdict is precisely the sort of structural error that cannot be subject to routine harmless error review." *Ex parte Jones*, AP-75,896, Br. on Submission at 34 (Tex. Crim. App. 2009); *see also id.* at 34-35.

Finally, Jones's argument that he raised the claim in his third state writ application or subsequent briefing begs the question: If his statement of the claim in his state briefing and accompanying arguments can somehow be read to encompass his present Claim II, why then did Jones feel compelled to raise it as an expressly separate claim in his federal petition? Logically, the answer can

29

only be that it is because Jones did *not* raise Claim II in the court below.

### 2.   *Reese* and *Digmon* are inapposite.

Jones contends that *Castille* is not on point and that *Baldwin v. Reese*, 541 U.S. 27 (2004), and *Smith v. Digmon*, 434 U.S. 332 (1978), instead control this case.  D.E. 17 at 21-23.  Jones's reliance on these two cases is misplaced.  In *Reese*, the petitioner, who was represented by counsel, asserted that he received ineffective assistance from both his trial and appellate counsel, and added that he was being held in violation of Oregon state law.  541 U.S. at 29.  While Reese explicitly tied the allegations of his trial counsel's ineffectiveness to several federal constitutional provisions, he did not allege that appellate counsel's performance violated the federal constitution.  *Id.* at 29-30.  The district court determined that Reese had not fairly presented his federal ineffective assistance of appellate counsel claim, but a divided Ninth Circuit panel reversed, reasoning that the federal nature of the claim would have been evident if the Oregon Supreme Court had read the opinion of the lower appellate state court, which it had an opportunity to do.  *Id.*  But the Supreme Court rejected the Ninth Circuit's interpretation of the fair presentation requirement, holding that:

> a state prisoner does not "fairly present" a claim to a state court if that court must read beyond a petition or brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so.

*Id.* at 32.  The passage Jones cites from *Reese* merely explains how a petitioner

30

can make clear in a state writ petition, for exhaustion purposes, that he is
raising a *federal*, as opposed to state law claim:

> A litigant wishing to raise a *federal* issue [as opposed to a state-law
> issue] can easily indicate *the federal law basis* for his claim in a
> state court petition or brief, for example, by citing in conjunction
> with the claim the federal source of law on which he relies or a case
> deciding such a claim on federal grounds, or by simply labeling the
> claim "federal."

*Id.* at 32. Because the issue regarding Jones's petition is whether he sufficiently
alerted and thus fairly presented two separate federal claims—rather than one
state law and one federal law claim—to the CCA, the passage he cites from
*Reese* is thus inapposite.

Further, to the extent Jones argues that Claim II was reasonably
encompassed in his third state writ application, *Reese* does not support his
position. The Supreme Court also rejected Reese's argument that his petition
by itself alerted the Oregon Supreme Court to the federal nature of his appellate
ineffective assistance claim:

> Reese must concede that his petition does not explicitly say that the
> words "ineffective assistance of appellate counsel" refer to a federal
> claim. The petition refers to provisions of the Federal Constitution
> in respect to *other* claims but not in respect to this one. The petition
> provides no citation of any case that might have alerted the court to
> the nature of the claim. And the petition does not even contain a
> factual description supporting the claim.

*Id.* at 33. Like Reese's defective petition (and unlike Jones's federal petition,
which demonstrates that Jones could have explicitly stated the claim if he had

31

indeed wished to do so), Jones's third writ application and brief on submission did not expressly assert that the nullification instruction constituted an independent claim of error. *Reese* is accordingly of no help to Jones.

*Smith* is similarly inapposite. Smith alleged in his federal habeas petition that the prosecuting witness's in-court identification of him resulted from an out-of-court identification at an impermissibly suggestive photographic array and later uncounseled lineup. 434 U.S. at 332. In conducting its exhaustion analysis of the claim, the district court looked only to Alabama Court of Criminal Appeals's opinion, which contained no reference to it. *Id.* Finding it "inconceivable" that the Alabama court would not have written on the claim if Smith had actually raised it, the district court found Smith's claim to be unexhausted. *Id.* at 332-33. The Fifth Circuit subsequently denied Smith a certificate of probable cause. *Id.* at 333. On certiorari review, the Supreme Court ordered filing of the briefs actually submitted in the Alabama Court of Criminal Appeals. *Id.* After examining those briefs, the Court determined that Smith had "squarely raised" his claim, and moreover, the State Attorney General had devoted two of its seven pages to argument answering the contention. *Id.* The Court concluded that a determination of whether a petitioner has satisfied 28 U.S.C. § 2254(b)'s exhaustion requirement "cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim squarely raised in petitioner's brief in the state court, and, indeed, in this case,

vigorously opposed in the State's brief." *Id.* It also noted that a district court commits plain error if it assumes that a habeas petitioner must have failed to raise a claim in the state courts merely because the state appellate court's opinion does not refer to the claim. *Id.* at 333-34.

Smith is simply inapposite to Jones's case. For the reasons the Director has discussed, Jones's third writ application and accompanying briefing demonstrate this is not a case in which Jones "squarely presented" his claim to the CCA, but the CCA "ignored" it. Jones simply did not raise the claim. And unlike the respondent's brief in *Smith*, the State's opposing brief below did not identify the present Claim II as an issue. *See Ex parte Jones*, AP-75,896, Resp.'s Br. at 15 (Tex. Crim. App. 2009). Also, the State devoted no portion of its argument to answering why the nullification instruction did not represent an independent error, apart from an underlying *Penry* error. *Id.* at 15-33. Like Jones, to the extent the State mentioned "structural error," it was limited to the context of the proper harm analysis to apply should the CCA find a *Penry* violation. *Id.* at 15-25.

## II.   Jones's Contention That State Court Remedies Are Available To Him Is Meritless.

Jones contends that Claims IV, VII, VIII, and IX, which he exhausted upon his most recent return to state court, are not procedurally defaulted. D.E. 33 at 50-59, 76-78. To the extent the Court finds any other claim unexhausted,

he asks the Court for yet another stay and abeyance under *Rhines*.  But a stay and abeyance is patently not warranted at this late date, when Jones had an opportunity to exhaust any unexhausted claims during his last trip to state court.  Indeed, Jones availed himself of this opportunity regarding Claims VII, VIII, and IX, although those claims were not within the scope of the Court's most recent order imposing a stay in this case so that Jones could return to state court to exhaust Claim IV.[10]  And to the extent Jones asserts that Claims IV, VII, VIII, and IX are not procedurally defaulted, the Fifth Circuit's recent decisions in *Balentine v. Thaler*, No. 09-70026, 2010 U.S. App. LEXIS 23699 (5th Cir. Nov. 17, 2010), and *Rocha v. Thaler*, Nos. 05-70028 & 09-70018, 2010 U.S. App. LEXIS 23696 (5th Cir. Nov. 17, 2010), squarely foreclose his arguments.

## A.  Jones misconceives the application of the *Long*[11] presumption.

Initially, Jones invites this Court to erroneously apply the *Long* presumption.  The Supreme Court will not review any federal law question

---

[10]     In addition to presenting his *Brady* claim (Claim IV) to the state courts for the first time, Jones also alleged there for the first time that trial counsel was ineffective for failing to retain a ballistics expert to challenge the determination that the bullet strike in the driver's side door was caused by Jones's firearm, SHCR-04 at 32-36; trial counsel was ineffective for failing to conduct a reasonable mitigation investigation, which would have enabled counsel to present evidence that Jones was raised "in an environment of poverty, domestic abuse, and alcoholism," SHCR-04 at 36-38; and appellate counsel rendered ineffective assistance because he did not challenge the trial court's denial of Jones's motion to suppress.  SHCR-04 at 43-49.  These correspond to Claims IV, VII, VIII, and IX from Jones's first amended federal habeas petition.

[11]     *Michigan v. Long*, 463 U.S. 1032 (1983).

34

decided by a state court when the decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The Court has also applied the independent and adequate state ground doctrine "in deciding whether federal district courts should address the claims of state prisoners in habeas corpus actions." *Id*. This procedural default doctrine bars federal habeas review whenever a state court declines to address a prisoner's federal claims because the prisoner fails to satisfy a state procedural requirement. *Id*. at 729-30; *see also Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977).

The Supreme Court has also recognized that difficulties may arise in the doctrine's application. For example, sometimes state court opinions "discuss federal questions at length and mention a state law basis for decision only briefly," or "derive principles by reference to federal constitutional decisions" while purporting to apply state constitutional law. *Coleman*, 501 U.S. at 732. In *Long*, the Court clarified how federal courts should apply the independent and adequate state ground doctrine in such circumstances. *Long* provided a form of presumption administered through a two-part, conjunctive test. If a state court decision "fairly appears to rest primarily on federal law, or to be interwoven with federal law," federal courts should presume that the state court's decision turned on federal law unless the "adequacy and independence of any possible state law ground" was "clear from the face of the opinion." *Long*, 463 U.S. at 1040-41.

The first part of the test forms the predicate for the *Long* presumption: the state court decision must first fairly appear to rest primarily on federal law or to be interwoven with federal law. *See id.* Once this predicate is satisfied, the second part of the test asks whether the state court has provided a plain statement of the independent and adequate state ground underlying its decision. If it has not, the *Long* presumption applies: federal courts will presume that "the state court decided the case the way it did because it believed that federal law required it to do so." *Id.*

When the Supreme Court extended *Long* to habeas cases in *Harris v. Reed*, 489 U.S. 255, 263 (1989), it created some confusion regarding whether the *Long* presumption applied to all state court procedural default holdings that did not clearly and expressly state an independent and adequate state ground for decision, or only to those that fairly appeared to rest primarily on federal law or to be interwoven with federal law. The confusion resulted from a portion of the *Harris* opinion in which the Court omitted the critical prerequisite that the state decision first fairly appear to rest primarily on federal law, and appeared to impose a "clearly and expressly" requirement on all procedural default decisions. *See Harris*, 489 U.S. at 263.

In *Coleman*, however, the Supreme Court specifically addressed and rejected this interpretation, noting that the prisoner "read the rule out of context." 501 U.S. at 736. The Court explained that "*Harris* describes the *Long*

36

presumption, and hence its own, as applying only in those cases in which it fairly appears that the state court rested its decision primarily on federal law." *Id.* (internal quotation marks omitted). Indeed, *Coleman* repeatedly emphasized that the *Long* presumption cannot apply, and the state court will be under no obligation to clearly and expressly identify an independent and adequate state law ground for its decision, unless it first fairly appears that its decision turns primarily on federal law. *See, e.g., id.* at 735 ("A predicate to the ... presumption is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law."); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991).

The Fifth Circuit, sitting en banc, has since recognized that, unless a state court decision appears to rest primarily on federal law, the *Long* presumption does not apply. *See Young v. Herring*, 938 F.2d 543, 553 (5th Cir. 1991) (en banc) (noting that *Coleman* "explicitly rejected [the] contention that the *Harris* rule should apply whenever the state court decision does not contain a plain statement that it relied on a state procedural bar," and recognizing that a necessary "predicate" to the application of the *Harris* rule "'is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law.") (quoting *Coleman*, 501 U.S. at 735); *see also Hogue v. Johnson*, 131 F.3d

37

466, 493 (5th Cir. 1997).   In withdrawing its earlier opinion expressing a
contrary view, the *Balentine* panel rejected its original, legally untenable
position.  U.S. App. LEXIS 23699 at *18.

> ### B. Because the CCA's dismissal of Jones's fourth state habeas application does not fairly appear to rest primarily on federal law, the *Long* presumption does not apply.

By statute, Texas prisoners have a limited right to have successive habeas
applications considered by the state courts.  But a capital inmate's successive
habeas application may only be considered on the merits if it satisfies Texas
Code of Criminal Procedure Article 11.071, section 5(a).  Whether Jones's *Brady*
allegations represented by Claim IV and his ineffective-assistance allegations
represented by Claims VII, VIII, and IX are procedurally defaulted turns on the
CCA's perfunctory dismissal of his fourth state habeas application.  The CCA
dismissed Jones's fourth state habeas application in an order that read, in
pertinent part: "[Jones] presents four allegations. [Jones's] claims fail to meet
the dictates of Article 11.071, § 5.  Accordingly, we dismiss his application." *Ex
parte Jones*, No. 62,589-04, Order (Tex. Crim. App. 2010).

Notably, nothing on the face of the CCA's dismissal order, which is
virtually identical to the dismissal order at issue in *Balentine*, *see* U.S. App.
LEXIS 23699 at *13, suggests that the court grounded its decision on federal
law, as opposed to the procedural default of claims that Jones could have
presented in his previous state habeas applications.  Accordingly, the dismissal

38

order itself cannot establish the necessary "predicate" for the application of the *Long* presumption, i.e., that the state court decision appeared to rest primarily on federal law or to be interwoven with federal law. *Id.* at *18-19. This fact ends the Court's *Long* inquiry, and leads only to the conclusion that Claims IV, VII, VIII, and IX are procedurally defaulted.

III. **Jones's Argument Concerning The Interplay Of 28 U.S.C. § 2254 (e)(1) And § 2254(d)(1)-(d)(2) Is Without Merit.**

Regarding Claims V, VI, and XII, Jones argues that the state court's fact findings are not entitled to deference under 28 U.S.C. § 2254(e)(1) and that review is de novo because he is mounting a challenge pursuant to § 2254(d)(2), i.e., arguing that the state court's fact-finding processes were somehow deficient. D.E. 33 at 67-75, 83. But the Fifth Circuit has considered and rejected this argument in *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001). Jones is implicitly arguing that this Court should apply a pre-AEDPA version of § 2254, a framework that AEDPA specifically abandoned. *See id.* at 948-51 (discussing the former versus the current version of 28 U.S.C. § 2254(d)). Valdez unequivocally establishes that the state court's factual findings are entitled to deference under § 2254(e)(1) unless Jones rebuts their presumptive correctness by clear and convincing evidence, which he has not done.

IV. **Jones Misconstrues The Discovery Standard.**

To the extent Jones asks the Court's leave to conduct discovery regarding

his *Brady* and other claims, he has misconstrued the requirements for a showing of "good cause."   Parties to a federal habeas action under 28 U.S.C. § 2254 generally are not entitled to discovery under the Federal Rules of Civil Procedure.  Rather, under the Rules Governing Section 2254 Cases in the United States District Courts, a party may invoke discovery processes only if and to the extent that the court grants leave "for good cause shown."  Rule 6, 28 U.S.C. fol. § 2254; *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997); *Gibbs v. Johnson,* 154 F.3d 253, 258 (5th Cir.1998).  "Good cause may be found when a petition for habeas corpus relief 'establishes a prima facie [case] for relief.'"  *Murphy v. Johnson,* 205 F.3d 809, 814 (5th Cir. 2000) (quoting *Harris v. Nelson,* 394 U.S. 286, 289 (1969)).  Moreover, a petitioner's "allegations must be specific, as opposed to merely speculative or conclusory, to justify discovery."  *Hill v. Johnson,* 210 F.3d 481, 486 (5th Cir. 2000) (citing *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Rule 6 . . . does not authorize fishing expeditions")); *see (Raymond James) Jones v. Johnson,* 171 F.3d 270, 278 (5th Cir. 1999) ("Jones' [s]. . . claim that he is entitled to discovery must . . . fail, as he has not made specific factual allegations showing that he is entitled to discovery."); *Gibbs,* 154 F.3d at 259 (affirming district court's denial of discovery because "Gibbs did not make the kind of particularized allegations or showing demanded by *Bracy*"); *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994); *see also Green v. Johnson*, 160 F.3d 1029, 1036 n.2 (5th Cir. 1998) ("It is not the job of an appellate court

to go on a fishing expedition through the record to find facts favoring or disfavoring an appellant's arguments. Rather, it is the job of a party before this court to supply in its brief relevant record cites in order that this court may properly review his arguments.").[12] Further, "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey,* 429 U.S. 545, 559-560 (1977); *accord Taglianetti v. United States,* 394 U.S. 316, 317 (1969) (a defendant "has no right to rummage in government files"). The scope of discovery is even more restrictive in a federal habeas action, where the inquiry must be "relevant and appropriately narrow." Advisory Committee Note to Rule 6, 28 U.S.C. fol. § 2254.

Relying on *Bracy* and *Murphy*, Jones asserts that he need not establish a prima facie case for relief in order to meet Rule 6(a)'s "good cause" requirement. But Jones takes *Bracy* out of its context, and in doing so strains the Court's holding. Nevertheless, even to the extent *Bracy* can be read to mean that a petitioner may, in an extraordinary case, rely on something less than a prima facie case in order to satisfy the rule's "good cause" requirement, the case does not aid Jones's discovery request; the support Jones offers for his speculative

---

[12]   Of course, Jones is not entitled to now alter the factual basis of his claims from those presented to the state courts. *See Williams v. Taylor*, 529 U.S. 420, 438-39 (2000) (AEDPA barred petitioner from further factual development of *Brady* claim where he had notice of the factual basis of the claim at the time of state habeas proceedings but failed to develop the evidence); *Livingston v. Johnson,* 107 F.3d 297, 306 n.7 (5th Cir. 1997) (holding that petitioner could not rely on evidentiary proof that was not presented to the state courts).

41

allegations does not remotely rise to the level the petitioner supplied in *Bracy*. And to the extent Jones cites *Murphy* as supporting his reading of *Bracy*, his reliance on *Murphy* is entirely misplaced. As briefed below, *Murphy* represents the Fifth Circuit's proper reading and application of *Bracy*. In *Murphy*, the Fifth Circuit concluded that a prima facie case *is* necessary to satisfy Rule 6(a)'s "good cause" standard and affirmed the lower court's denial of discovery on the petitioner's entirely speculative *Brady* claim.

### A. *Bracy* is easily distinguished from Jones's case.

*Bracy* is truly an extraordinary case. Bracy was tried, convicted, and sentenced to death before then-Judge Thomas J. Maloney for Bracy's role in an execution-style triple homicide. *Bracy*, 520 U.S. at 900-01. Maloney was later convicted of taking bribes from defendants in criminal cases. *Id.* at 901. The evidence from Maloney's trial showed that before being appointed to the bench, Maloney was a criminal defense attorney with close ties to organized crime; he often paid off judges in criminal cases. *Id.* at 901-02. Once he became a judge, Maloney exploited the relationships and connections he had developed while bribing judges to solicit bribes for himself. *Id.* at 902. For example, Maloney used a bailiff through whom he had bribed judges while he was in practice, as well as an attorney from his former law firm, Robert McGee, to serve as intermediaries between himself and lawyers seeking a fix. *Id.* Two such lawyers, Robert J. Cooley and William A. Swano, served as key witnesses

against Maloney at Maloney's trial. *Id.*

Four months after Maloney's conviction in federal district court for conspiracy, racketeering, extortion, and obstructing justice, Bracy filed a federal habeas petition alleging that he had been denied a fair trial. *Id.* at 902. Bracy theorized that, in an effort to camouflage the fact that Maloney had accepted bribes from defendants in some cases, Maloney favored the prosecution in cases such as Bracy's, in which Maloney did not receive a bribe. *Id.* Bracy sought discovery in support of his claim, namely, (1) the sealed transcript of Maloney's trial; (2) reasonable access to the prosecution's materials in Maloney's case; (3) an opportunity to depose Maloney's associates; and (4) a chance to search Maloney's rulings for a pattern of pro-prosecution bias. *Id.*

In support of his petition and discovery request, Bracy submitted a copy of Maloney's indictment, and a newspaper article describing testimony from Maloney's trial, in which Swano described an additional uncharged incident where he bribed Maloney to fix a murder case. *Id.* at 906. Swano also testified that Maloney had retaliated against his client in one of the few cases in which Swano had not offered the judge a bribe. *Id.* at 906 n.5. Bracy further offered evidence that his trial lawyer was Maloney's former law partner, as well as the United States's Proffer of Evidence in Aggravation from Maloney's sentencing, which detailed Maloney's corruption both before and after Maloney became a judge. *Id.* The United States's proffer asserted that Maloney fixed serious felony

43

cases regularly while a practicing criminal defense attorney; that, as a judge, he continued to corrupt justice through the same political relationships and organized crime connections he had exploited as a lawyer; and that at least one attorney from Maloney's former law firm, Robert McGee, was actively engaged in assisting Maloney's corruption, both before and after Maloney took the bench, and even bribed Maloney himself. *Id.* at 906-07. The proffer also confirmed that Bracy's murder trial has been sandwiched tightly between other murder trials that Maloney fixed. *Id.* at 907. The district court denied the discovery request, and the Court of Appeals affirmed. *Id.* at 903.

The Supreme Court reversed, concluding that "given the facts of this particular case, it would be an abuse on discretion not to permit discovery" regarding Bracy's judicial-bias claim. *Id.* at 909.

> Ordinarily, we presume that public officials have properly discharged their official duties. Were it possible to indulge the presumption here, we might well agree with the Court of Appeals that [Bracy's] submission and his compensatory-bias theory are too speculative to warrant discovery. But, unfortunately, the presumption has been soundly rebutted: Maloney was shown to be thoroughly steeped in corruption through his public trial and conviction. We emphasize, though, that [Bracy] supports his discovery request by pointing not only to Maloney's conviction for bribe-taking in other cases, but also to additional evidence, discussed above, that lends support to his claim that Maloney was actually biased *in [Bracy's] own case.* That is, he presented specific allegations that his trial attorney, a former associate of Maloney's in a law practice that was familiar and comfortable with corruption, may have agreed to take this capital case to trial quickly so that [Bracy's] conviction would deflect any suspicion the rigged [two murder] cases [near in time to Bracy's] might attract.

*Id.* (internal quotations and citations omitted; emphasis in original).  In short, Bracy was able to provide support for his allegations through evidence elicited under oath during Maloney's public trial and conviction, as well as through additional evidence suggesting that Maloney was actually biased in Bracy's own case.  In contrast, Jones has provided nothing remotely similar in support of his speculative *Brady* or other allegations.  As discussed below, this Court should therefore reach the same conclusion as the Fifth Circuit reached in *Murphy*.

### B. *Murphy* likewise lends no support to Jones's position.

As the Fifth Circuit explained in *Murphy*, in upholding the district court's denial of the petitioner's discovery request, in *Bracy*, "[t]he Supreme Court noted that Bracy's claims were framed in specific terms and were supported by objective, concrete factual evidence tending to support his theory (i.e., [Maloney's] subsequent conviction and the other specific objective evidence)." *Murphy*, 205 F.3d at 814.  In contrast, Murphy merely speculated that the prosecutor had improperly coerced a jailhouse informant into testifying falsely against him.  *Id.* at 813.  Murphy then moved for discovery, asking leave to inspect and copy all documents, tapes, files, written reports, memoranda, notes, computer disks, or other written matter relating to the district attorney's investigation of his case.  *Id.*  The Fifth Circuit concluded that Murphy's allegations of prosecutorial misconduct and withholding of *Brady* material were insufficient to entitle him to discovery.  *Id.* at 814.  "Murphy has failed to

establish a prima facie claim under *Brady* by virtue of his having failed to demonstrate the existence or concealment of a deal between the prosecution and the [complained-of] witness or that proof of such a deal would be material to the outcome." *Id.* Here, Jones's case is much more closely aligned with *Murphy* than *Bracy*, and does not represent a case in which the petitioner is relieved from his burden of making a prima facie showing that he would be entitled to relief if allowed to develop additional evidence. As the Fifth Circuit said succinctly in *Murphy*, "[s]imply put, Rule 6 does not authorize fishing expeditions." *Id.*

## CONCLUSION

For the reasons discussed above and previously set forth in his amended answer and motion for summary judgment, the Director asks the Court to grant his amended motion for summary judgment, deny Jones's amended cross-motion for summary judgment, dismiss the petition with prejudice, and deny Jones a certificate of appealability.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General  for

46

Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

s/ Leslie K. Kuykendall
LESLIE K. KUYKENDALL*
Assistant Attorney General
State Bar No. 24029673
Southern District Admission No. 934972

*Attorney in Charge

P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 936-1400
(512) 320-8132 (FAX)
leslie.kuykendall@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I certify that on November 29, 2010, I electronically filed foregoing response with the Clerk of the Court for the Southern District of Texas, Houston Division, using the Court's electronic case-filing system.   The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Mr. David R. Dow
University of Houston Law Center
100 Law Center
Houston, TX 77204.
ddow@central.uh.edu

and

Mr. Jared Philip Tyler
Tyler Law Firm, PLLC
P.O. Box 764
Houston, TX 77001
jptyler@tylerlawfirm.org

                                          s/ Leslie K. Kuykendall
                                          LESLIE K. KUYKENDALL
                                          Assistant Attorney General